UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br>　　　　　Plaintiff,<br>　　v.<br>JEREMY WHITE,<br>　　　　　Defendant. | Case No. 14-cr-00020-WHO-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br>Re: Dkt. No. 24 |

　　　　Defendant Jeremy White moves to suppress the drugs found on his person and in the car he was driving pursuant to a traffic stop that led to a parole search. White argues that Officer Sedgwick, who initiated the traffic stop and the subsequent parole search, did not have reasonable suspicion of a traffic violation, that the stop was merely a pretext to search for drugs, and that the drug evidence must be suppressed. White also contends that the government's failure to comply with its discovery obligations compels me to grant his motion. However, I find that Officer Sedgwick had reasonable suspicion based on his experience to stop White based on Sedgwick's belief that White's car had an illegal headlamp emitting blue light. Nothing in his testimony at the evidentiary hearing (including a comparison between Sedgwick's testimony at the evidentiary hearing and his testimony at the preliminary hearing for Angela White in state court), or in the government's failure to produce discovery in this case, undermines Sedgwick's testimony about the headlamp. Because the headlamp was sufficient by itself to justify the traffic stop, the motion is DENIED.

　　　　As discussed in more detail below, I am troubled by the government's failure to produce necessary discovery prior to the evidentiary hearing, including all photographs taken at the scene as well as the transcript of Sedgwick's testimony in the state court proceeding. These failures are

1 serious.  But on the record before me they do not rise to the level of outrageous or flagrant

2 government misconduct.  Therefore, I also DENY White's request to dismiss the indictment or

3 otherwise sanction the government for its discovery failures.

## BACKGROUND

5 On October 12, 2013, just before midnight, Sonoma County Sheriff Officer Richard A.

6 Sedgwick noticed a car illegally parked in front of a house known to him for criminal activity.

7 August 18, 2014 Transcript of Evidentiary Hearing ("Tr.") at 5:20 – 6:2; 23:21-24.  The car was

8 parked partially in the driveway and across the sidewalk.  *Id*. at 23:10-14.  After Sedgwick

9 observed the car for five minutes, three people exited the house and entered the car.  *Id*. at 31:10-

10 12.  As the car drove towards where Sedgwick was parked, he noticed that the car "had a blue

11 head lamp" on the passenger side.  *Id*. at 6:16-24.  Sedgwick also noticed that the car failed to use

12 a turn signal when turning onto the main road.  *Id*. 7:8-19.  Sedgwick turned and followed the car.

13 While following the car, Sedgwick noticed that when the oncoming cars' headlights illuminated

14 White's car, he saw what appeared to be an air freshener hanging in the center of the windshield.

15 *Id*. at 8:2-8.  Sedgwick did not believe the air freshener was up to code.  *Id*. at 8:9-11.  He then

16 initiated a traffic stop.

17 Sedgwick approached the driver's side window.  White told him that he did not have a

18 license but gave Sedgwick his name and birthday and told him that he was on active parole.  *Id*. at

19 9:1-6.  Sedgwick asked White to exit the vehicle, checked him for weapons, and detained him in

20 handcuffs.  *Id*. at 9:5-6.  He searched White and located a baggie in White's waistline that

21 Sedgwick believed contained methamphetamine.  *Id*. at 13:9-19.  Sedgwick then identified the

22 other passengers – Floyd Self and White's wife Angela White – and directed them to exit the car.

23 *Id*. at 10:23-11:9.  Sedgwick then searched the car and found a paper bag rolled up with a rubber

24 band around it.  This bag contained methamphetamine.  *Id*. at 12:2-9.  He arrested White for the

25 drug possession.  Angela White was also arrested for possession of drug paraphernalia.

26 In his incident report, Sedgwick identified three reasons for initiating the traffic stop:

27   1. The passenger side headlamp was emitting a blue light in violation of Cal. Veh. Code §

1     25950(a).[1]

2  2. As the vehicle turned, it did not use a turn signal in violation of Cal. Veh. Code § 22108.[2]

3  3. The air freshener hanging from the rear view mirror obstructed the driver's view in
4     violation of Cal. Veh. Code § 26708(a)(2).[3]

5  *See* Attachment A to the Declaration of Jeremy White [Docket No. 26].

6     White responds in his declaration submitted in support of the motion to suppress that:

7  1. It is his custom and practice to always use turn signals and he is "certain" he did so on the
8     night of October 12, 2013, right before he was stopped.

9  2. Both headlamps on his car were emitting white light, from "the same type of halogen
10    headlamp bulbs that were originally installed in the car when it was new."

11 3. "[N]o air freshener" was obstructing his view.

12 White Decl. ¶¶ 3-5.

13    On August 18, 2014, I held an evidentiary hearing. Sedgwick was the only witness. The

14 parties submitted supplemental briefing following the evidentiary hearing, and I held a further

15 hearing on the motion to suppress on October 2, 2014. During the hearing, the defense pointed

16 out that it had recently come into possession of a copy of the transcript from Angela White's

---

[1] Cal. Veh. Code § 25950(a) provides:
The emitted light from all lamps and the reflected light from all reflectors, visible from in front of a vehicle, shall be white or yellow, except as follows:
(1) Rear side marker lamps required by Section 25100 may show red to the front.
(2) The color of foglamps described in Section 24403 may be in the color spectrum from white to yellow.
(3) An illuminating device, as permitted under Section 24255, shall emit radiation predominantly in the infrared region of the electromagnetic spectrum. Any incidental visible light projecting to the front of the vehicle shall be predominantly yellow to white. Any incidental visible light projecting to the rear of the vehicle shall be predominantly red. Any incidental visible light from an illuminating device, as permitted under Section 24255, shall not resemble any other required or permitted lighting device or official traffic control device.
[2] Cal. Veh. Code § 22107 provides: "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement." Cal. Veh. Code § 22107. Cal. Veh. Code § 22108 provides: "Any signal of intention to turn right or left shall be given continuously during the last 100 feet traveled by the vehicle before turning."
[3] Cal. Veh. Code § 26708(a)(2) provides: "A person shall not drive any motor vehicle with any object or material placed, displayed, installed, affixed, or applied in or upon the vehicle that obstructs or reduces the driver's clear view through the windshield or side windows."

3

preliminary hearing in state court, where Sedgwick testified. The defense argued that Sedgwick admitted in state court that he took photographs that became part of his incident report, which is not what he said in the evidentiary hearing before me (where he testified that someone else took photos of the car at the scene). The defense asserted that those contradictions undermined Sedgwick's credibility. Moreover, the defense claims that the failure to turn over a copy of the transcript before or during the evidentiary hearing violated the Jencks Act and Federal Rule of Criminal Procedure 26.2 and required the court to strike Sedgwick's testimony. I allowed the parties to submit additional briefing on the issue of the state court testimony and the remedy for the alleged Jencks Act violation.

## LEGAL STANDARD

A "police officer may conduct an investigatory traffic stop if the officer has 'reasonable suspicion' that a particular person 'has committed, is committing, or is about to commit a crime.'" *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (quoting *United States v. Lopez-Soto,* 205 F.3d 1101, 1104 (9th Cir. 2000)). "A traffic violation alone is sufficient to establish reasonable suspicion." *Id.*; *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000) ("Probable cause exists 'when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'").

"The reasonable-suspicion standard is not a particularly high threshold to reach. 'Although . . . a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266 (2002)); *see also United States v. Edwards*, 761 F.3d 977 (9th Cir. 2014) ("'Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" (quoting

4

1  *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014)). However, "a belief based on a mistaken
2  understanding of the law cannot constitute the reasonable suspicion required for a constitutional
3  traffic stop." *United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000). Where a stop is made
4  on a "mistaken view of the law" cannot be reasonable because under the Fourth Amendment "'the
5  legal justification [for a traffic stop] must be objectively grounded.'" *Id*. (quoting *United States v.*
6  *Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)).

7        In *Whren v. United States*, the United States Supreme Court rejected "the argument that the
8  constitutional reasonableness of traffic stops depends on the actual motivations of the individual
9  officers involved." 517 U.S. at 813.  However, courts have clarified that an officer's subjective
10 motivations (or pretext for a stop) are nevertheless relevant in assessing the credibility of an
11 officer.  *See, e.g., United States v. One Million Thirty-Two Thousand Nine Hundred Eighty*
12 *Dollars in U.S. Currency ($1,032,980.00)*, 855 F. Supp. 2d 678, 692 (N.D. Ohio 2012)
13 ("notwithstanding the principle articulated in *Whren*, *supra*, an officer's subjective motivations
14 may nevertheless be relevant in assessing the credibility of the officer on the matter of whether an
15 actual traffic violation was truly observed, or there was no genuine traffic violation, and the stop
16 was a pretext."); *United States v. Alix*, 630 F. Supp. 2d 145, 147  (D. Mass. 2009) (*Whren* decision
17 "which legitimized pretextual traffic stops so long as there is an objective basis for the stop, does
18 not obviate the need for this Court to evaluate the credibility of the testifying officers" and
19 concluding that "'Pretext' after all, does not mean that officers can testify about traffic violations
20 when the record suggests they did not happen. In this case, testimony about the traffic violation is
21 so contrived, so little supported by the evidence, so shot through with inconsistencies, I cannot
22 believe it provided an objective basis for the stop at all.").

## DISCUSSION

### I. MOTION TO SUPPRESS BASED ON SEDGWICK'S TESTIMONY AND CREDIBILITY

Having reviewed the testimony from the evidentiary hearing and the supplemental briefing, I conclude that Sedgwick had reasonable suspicion that White's car had an illegal blue headlamp, which makes it sufficient to justify the traffic stop.

1   Sedgwick testified, based on his training and experience, that he understood that
2   headlamps emitting blue light were most likely after-market lamps that were illegal. Tr. 6:19-7:7.
3   White does not dispute that under California law, lamps emitting blue light are illegal. White
4   instead makes several arguments regarding the blue light.

5   First, he asserts that California law allows lights that emit a "blue tint," and Sedgwick's
6   failure to understand the "scope" of the applicable law meant Sedgwick made a mistake of law
7   during the stop. He says that Sedgwick's belief that the "bluish" headlamp was illegal cannot
8   form reasonable suspicion because White did not understand at the time of the stop that California
9   law incorporated federal safety standards and allowed a "range" of white colors, with yellowish to
10  bluish tints. Supp. Brief at 11-13; Reply at 3. He contends that because Sedgwick was unfamiliar
11  with the federal standards, his belief that the headlamp emitting blue light was illegal, was a
12  mistake of law.

13  As an initial matter, there is no evidence in the record that undermines Sedgwick's
14  testimony that he believed that a "blue tint" was "emitting from the light instead of a white light"
15  in violation of California law. Sedgwick expressly denied that the light being emitted was "bluish
16  white" and insisted it was "blue." Tr. at 35. In addition, White fails to submit any evidence as to
17  the exact type and age of headlamp installed in his BMW at the time of the incident. White's
18  declaration states only that, "Both headlights were emitting white light through the same type of
19  halogen headlamp bulbs that were originally installed in the car when it was new." White Decl. ¶
20  4. White does not say when the lamps were installed, what their model number or "type" were,
21  whether they were OEM or after-market, or provide any other details. White's vague assertion
22  does not undermine Sedgwick's testimony that the passenger-side headlamp was emitting a blue
23  light.

24  Moreover, that an officer may not have known of the specific federal standards (as
25  incorporated into California law) does not mean that the officer cannot make a reasonable traffic
26  stop based on his training and experience in detecting illegal after-market headlamps that emit
27  blue light. As the evidence submitted by the defense during the evidentiary hearing explains, in
28  BMWs like the car driven by White the factory installed (OEM) lights can give off a

6

1   "bluish/purple look." Def. Ex. E. However, as the lights age, their color can change, and as a
2   result when lamps are changed at different times, one can look yellow and the other blue. *Id*.
3   Sedgwick testified that he did not know if that was true or not, but that on White's car one of the
4   headlamps was emitting a blue light. Tr. at 48:8.
5       At most, Sedgwick may have made a mistake of fact that one of the headlamps was in fact
6   emitting an amount of blue light or tint that was illegal, as compared with the other bulb which
7   was not. Mistakes of fact, however, do not undermine an officer's reasonable suspicion to conduct
8   a traffic stop. *See, e.g., United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) (a "mere
9   mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to
10   a reasonable suspicion that criminal activity was afoot.").
11       White next contends that the stop was unreasonable because Sedgwick did not use any
12   objective means to test the headlamp's color (such as a photometer) to determine whether the lamp
13   fell within the acceptable light range. However, he cites no cases or authority to support his
14   argument that police officers cannot rely on their training to detect illegal after-market lamps and
15   must, instead, use photometers or other tools to do so before being able to initiate a traffic stop for
16   a suspected violation of California Vehicle Code section 25950(a).
17       White further asserts that Sedgwick's failure to further investigate the headlamp violation
18   after the stop – he did not test the lamp or have photos taken of the lamps after the stop –
19   undermines Sedgwick's credibility and the reasonableness of the stop. Supp. Brief at 15-16.
20   However, the incident became a parole search immediately after the traffic stop, since White was
21   on parole. Sedgwick quickly found drugs on White, and thereafter the drugs became the
22   understandable focus of the investigation and arrest. Given the circumstances of this case, that no
23   further investigatory actions were taken with respect to the headlamp emitting a blue light does not
24   undermine the reasonableness of the stop.
25       In support of White's argument that Sedgwick should have investigated and documented
26   the issue with the headlamp to support the reasonableness of the stop, he relies on *United States v.*
27   *Harvey*, 2010 WL 3219314 (N.D. Ind. Aug. 13, 2010). In that case, an officer initiated a traffic
28   stop because the defendant's license plate was not illuminated by two lights as required under state

law. The government relied only on the testimony of the officer who initiated the stop, but noted that he did not have confirming testimony from the other officer who arrived on the scene and did not have photographic evidence. The defendant, on the other hand, relied on (i) testimony from his cousin, who took possession of the car after the defendant's arrest and testified that the lights worked, and (ii) photographs taken by defendant and an investigator which also confirmed the lights were working. Based on that evidence and on the credibility of the witnesses who testified – the court found that defendant's witnesses were credible but doubted the credibility of the officer because he changed the justifications for the stop from ones he asserted in the incident report to new ones he relied on at the hearing – the court concluded that the government had failed to meet its burden to prove by a preponderance of the evidence that the stop was reasonable. *Id*. at *5-6.

Here, Sedgwick's testimony has been consistent, his credibility was not undermined at the hearing, and the defense did not present any evidence to undermine Sedgwick's first-hand observations about the blue light coming from the passenger side headlamp other than the declaration from White that was lacking sufficient detail. Critically, the fact that the traffic stop became a parole search, rather than a search only incident to a traffic stop, alters the nature of this case. The drugs found incident to the parole search, that was incident to the traffic stop, changed the focus of the investigation and, relatedly, the evidence collected with respect to White's vehicle. That fact was wholly absent from *Harvey*.

Similarly, in *United States v. Ruiz*, 832 F. Supp. 2d 903, 914 (M.D. Tenn. 2011), the district court found the arresting officer lacked credibility because his testimony differed in a key respect between his report and at the evidentiary hearing, an officer on the scene refused to corroborate the arresting officer's testimony, and he had poor demeanor on the stand. *Id*. The court also felt "compelled to note that the central issue in this case – whether the Ruiz vehicle was speeding – would likely not be in dispute" if the officers had "simply used the technology at their disposal to create documentary evidence of the defendants' alleged traffic violation," including a radar unit which interfaced with a dashboard camera. *Id*. at 916. The court concluded that the failure "to employ such simple technological means is particularly egregious here," given that the officer was a drug interdiction officer and essentially all of his traffic stops are "pretextual

1  attempts to find illegal drugs." *Id*. None of the factors present in *Ruiz* are present in this case and
2  the parole search fundamentally altered the focus of the investigation here, making any failure to
3  document the problem with the headlamp not unreasonable.[4]

4  White argues that Sedgwick's credibility has been undermined on two additional grounds.
5  First, White contends that Sedgwick's credibility is undermined because he admitted at the
6  evidentiary hearing that the house where White's car was illegally parked was known to him to be
7  a house where drug activity occurred, but denied that he was interested in stopping White's car to
8  look for drugs or evidence of other criminal activity. *But see United States v. Shipp*, 11-CR-284,
9  2012 WL 2370423 (E.D. Wis. Apr. 24, 2012) *report and recommendation adopted*, 11-CR-284,
10 2012 WL 2370682 (E.D. Wis. June 21, 2012) ("Baker did not attempt to stretch his testimony to
11 hide his real interest in the defendant. Baker readily admitted that, although he pulled the vehicle
12 over for the traffic violations, he wanted to make contact with the defendant and to talk with him
13 regarding the drug complaint. (Excerpt Tr. 17.) In my view, although the officer's subjective
14 motive is irrelevant to the legality of the stop, Baker's candidness about his motivation
15 strengthened his credibility."). Sedgwick's testimony on this minor point may not have enhanced
16 his credibility but it does not undermine his testimony on the issues material to this motion.
17 White's argument to the contrary is not persuasive.
18 Second, White asserts that Sedgwick has withheld information from the defense, further

---

[4] *United States v. Rogers*, 2006 WL 3776382 (S.D. Ind. Dec. 20, 2006) is likewise inapposite. There, the court concluded there was no "honest mistake" as to whether a license plate was expired because of contradictions in the officer's testimony in addition to the fact "that Officer Gorgievski claimed not to remember whether he made – and in fact failed to make – even the most basic effort to check on the license plate after the stop further undermines his credibility and emphasizes the pretextual character of the stop." Similarly, in *United States v. Morse*, 2008 WL 1751382 (E.D. Wis. Apr. 11, 2008), the fact that defendants received "no citation significantly undercuts the officers' testimony that he did in fact disregard the traffic light," where there was also no "mention of this alleged violation in the incident report." Here, Sedgwick's testimony has been consistent and the blue headlamp *was* mentioned in the incident report. In *United States v. Diaz-Diaz*, 211 F. Supp. 2d 1252 (D. Mont. 2002), the Court found that the officer's purported safety-stop was undermined by the fact he did not stop the vehicle until backup arrived, he did not question the driver about the safety issue, and the officer followed the vehicle for 8 miles through a low-traffic area only to stop it in a high-traffic area. Therefore, "[t]he totality of the circumstances here show that this was not a legal stop. Nelson admitted that he had no suspicion of any criminal activity afoot, and that he stopped the van for safety concerns, but his actions belie his words." *Id*. at 1256. The circumstances here are significantly different, as the incident quickly turned into a parole search and the headlamp was mentioned in the incident report.

undermining his credibility. The withheld information included nine photographs of the car taken during the incident and search. Those nine photographs were not produced by the government with the incident report but were only secured after the defense subpoenaed records from the County. The withheld information also included the transcript of Sedgwick's testimony in state court at the preliminary hearing of Angela White (who was arrested during the incident for possession of drug paraphernalia). Despite defendant's request, the government did not provide him with a copy of that testimony prior to the October 2, 2014 hearing. Defense counsel obtained a copy through his own efforts. He argued that Sedgwick's testimony at the evidentiary hearing that he did not take photographs during the incident was contradicted by his state court testimony.

White places the blame for the failure to produce discovery (the photos and the state court transcript) on Sedgwick, but the blame is misplaced. Motion at 8-9, n1; Reply at 12-14. With respect to the photographs, Sedgwick testified at the evidentiary hearing that he attached seven photos to his incident report and that he was unaware that there were other photographs. Tr. 52-53. He also said that officers do not attach every single photograph taken at a scene to the incident reports because that could "bog down the system," but he wasn't sure whether adding the nine additional photographs would have actually bogged down the system. *Id*. at 54-55. Sedgwick added that as far as he knew, the nine additional photographs were not withheld from government counsel for any reason. *Id*. at 55.

I find that the omission of the nine photographs from the incident report (and, therefore, from production to defendant by government counsel) does not undermine Sedgwick's credibility. At most, (i) the additional photographs show that no photographs were taken of the headlamps while they were illuminated (a point Sedgwick does not dispute) and (ii) some of the additional photographs show more clearly where the air freshener was positioned – which Sedgwick testified during the evidentiary hearing was a few inches below the rearview mirror and "quite low" on the windshield.

While White theorizes that the photos were "withheld" because they undermine Sedgwick's testimony as to the position of the air freshener (how low it was and whether it hung parallel or perpendicular to the windshield), there is no evidence that the additional photos were

10

1  not attached to the incident report for an improper purpose, that the failure to attach the photos was
2  against protocol, or that they were attached to the incident report but then improperly withheld
3  from production.  There is no basis to assume that Sedgwick or government counsel did anything
4  improper regarding the additional photographs.

5  With its supplemental briefing following the October 2, 2014 hearing, the government
6  submitted the declaration of Kyle Philp.  Philp is a detective with the Santa Rosa Police
7  Department and the contact for the government with respect to securing and producing the
8  incident report and photos surrounding White's arrest.  Docket No. 59 ¶ 3.  Philp states that he
9  called the Sonoma County Sheriff's Office and requested production of "all relevant photographs
10 relating to the traffic stop of the defendant," and that he produced to the government all the reports
11 and photographs he received, which included only the initial seven photographs.  *Id.*[5]  His
12 declaration clarifies that Sedgwick played no role in withholding photos from the defense.

13 The state court testimony does not undermine Officer's Sedgwick's testimony at the
14 evidentiary hearing nor support defendant's allegation that Sedgwick committed perjury.  At the
15 evidentiary hearing, Sedgwick was repeatedly asked about "photos taken of the car" and the
16 headlamp.  *See* Tr. at 51:25 – 52:3 ("Q. After the search, photos -- or as part of the search, **photos**
17 **were taken of the car**, correct? A. Correct.  Q. And you attached those photos to your incident
18 report? A. That's correct.") (emphasis added); 53:22-54:1 ("Q. So someone went to the trouble of
19 taking **photographs of the car**, but didn't bother to take pictures of the headlight; is that correct?
20 A. I was not the one taking pictures, so I can't really say what the thought process was.")
21 (emphasis added); 56:5-13 ("Q. So someone actually took the trouble of **taking a photo of the**
22 **headlight** but didn't turn on the light, right? A. Again, I didn't take these photos.  Q. Did you
23 direct the person to take the photos?  A. At some point, somebody arrived and offered to take
24 photos. Q. Did you tell them what it was that you were concerned about? A. No."); *see also* Tr. at

---

[5] White objects to and moves to strike the Philp declaration on the ground that it is not properly signed and is out of compliance with the Local Rules.  Docket No. 60.  The objections are noted but OVERRULED.  I order the government to file a copy of the Philp declaration with Officer's Philp's actual signature no later than **five (5) days** after the date of this Order.  White may renew his motion to strike if the government fails to comply.

11

1  15 – 16 (testifying as to three photos showing the interior of the car and testifying that he "did not
2  take these photos").
3      At the state court hearing, Sedgwick was asked about three photos showing the drugs and
4  drug paraphernalia found: one showing the brown bag in the engine compartment; one showing
5  the two baggies of suspected drugs found inside the bag in the engine compartment; and one
6  showing the pipe found on Angela White.  State Court Tr., attached as Exhibit A to Declaration of
7  Daniel P. Blank [Docket No. 56], at 8-9, 13 (testifying that he "documented" the area where the
8  drugs were found with photographs, and that he took the photograph of the paper bag in the engine
9  compartment, a photograph of the baggies found in the bag, and a photograph of the pipe found on
10 Angela White).  Sedgwick did not testify in state court whether he took photos of the car itself
11 (interior, headlamps, etc.) and he was not asked at the evidentiary hearing here whether he
12 specifically took the photos of the drugs and paraphernalia.
13     Therefore, I find that the state court transcript does not undermine Sedgwick's credibility.
14 This conclusion, however, does not mean that the state court transcript was not covered by *Brady*
15 or *Jencks* and in no way detracts from my conclusion, discussed below, that the government
16 should have provided the transcript to the defense before the evidentiary hearing.  The state court
17 transcript could have been used to establish exactly who took which pictures during the
18 evidentiary hearing, clarifying the record and saving the time that has now been expended on this
19 issue by the Court and the parties.
20     After having had the opportunity to observe Sedgwick on the stand, I find that his
21 testimony was materially consistent on direct and cross-examination as well as with all other
22 evidence in the case, and that he was a credible witness.
23     Because I find that Sedgwick had reasonable suspicion to stop White for the headlamp
24 emitting blue light, I DENY the Motion to Suppress based on Sedgwick's actions or credibility.
25 As a result, I need not reach the question of whether the traffic stop was also justified by White's
26 alleged failure to use a turn signal or the air freshener.
27 **II.  MOTION TO SUPPRESS BASED ON JENCKS ACT VIOLATION**
28     White argues that even if the motion to suppress is denied because Officer Sedgwick's

1   testimony was credible, the motion to suppress should nevertheless be granted because the
2   government's failure to turn over the state court transcript violated the Jencks Act, Federal Rule of
3   Criminal Procedure 26.2, and the Due Process clause pursuant to *Brady v. Maryland*, 373 U.S. 83
4   (1963) and its progeny.

5   The Jencks Act, as implemented by Rule 26.2, requires that "after a witness other than the
6   defendant has testified on direct examination, the court, on motion of a party who did not call the
7   witness, must order an attorney for the government or the defendant and the defendant's attorney
8   to produce, for the examination and use of the moving party, any statement of the witness that is in
9   their possession and that relates to the subject matter of the witness's testimony." Rule 26.2(a).
10  White argues that Sedgwick's state court testimony qualifies as a "statement" covered by Jencks
11  and Rule 26.2. White also asserts that because the evidentiary hearing testimony demonstrated
12  that Sedgwick had the opportunity to photograph the blue headlamp but did not, the state court
13  transcript was impeachment material that should have been turned over under *Brady* and *Giglio v.*
14  *United States*, 405 U.S. 150 (1972). The mandatory remedy for this violation, defendant asserts, is
15  striking Sedgwick's testimony under 26.2(e),[6] which would then require granting the motion to
16  suppress because the government failed to meet its burden of proof to show the stop was based on
17  reasonable suspicion.

18  In response, the government argues that was no *Brady* violation. The government assumes
19  – for purposes of this issue – that the state court transcript was favorable to the defendant and
20  impeachment material covered by *Brady*. Govt. Resp. Br. [Docket No. 57] at 6. However, the
21  government argues that because the transcript was publicly available, the government's failure to
22  secure a copy and produce it was not a *Brady* violation. *See, e.g., United States v. Ladoucer*, 573

---

[6] Fed. R. Crim. Proc. 26.2(e) provides: "Sanction for Failure to Produce or Deliver a Statement. If the party who called the witness disobeys an order to produce or deliver a statement, the court must strike the witness's testimony from the record. If an attorney for the government disobeys the order, the court must declare a mistrial if justice so requires." *See also* 18 U.S.C. § 3500(d) ("If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.").

13

F.3d 628, 636 (8th Cir. 2009) ("We conclude that the Government's failure to produce the transcript of Hartline's state court testimony did not violate Brady because the transcript was as available to Ladoucer as it was to the Government."). The government also asserts that there was no prejudice to White from its failure to disclose the transcript.[7] Prejudice "requires that the conduct have some impact on the outcome of the proceeding – i.e., a reasonable probability that the result of the proceeding would have been different or that it so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hein v. Sullivan*, 601 F.3d 897, 905 n.4 (9th Cir. 2010).

Here there is no prejudice to White from the government's failure to produce the state court transcript. The material points that White relies on to show the traffic stop was not based on reasonable suspicion with respect to the headlamp emitting blue light are that Sedgwick did not investigate the headlamp once the stop commenced and in particular that Sedgwick did not take or direct someone else to take pictures of the allegedly illegal headlamp while illuminated. However, both of those facts were *admitted* by Sedgwick during the evidentiary hearing. The only point the state court transcript weighs on is Sedgwick's credibility – e.g., whether White is correct that the state court transcript shows that Sedgwick perjured himself when he testified in the evidentiary hearing that he did not take any photographs of the *car* or *headlamp*. I have discussed that testimony above and I do not find that the state court transcript is necessarily contradictory or that Sedgwick's testimony in federal court was perjurious. White, therefore, has failed to show any prejudice from a *Brady* violation.

As to Jencks/Rule 26.2, the Ninth Circuit has explained that "[d]espite the mandatory ring" of Rule 26.2(e) requiring striking testimony for failure to produce statements, "a district court has discretion to refuse to impose sanctions for noncompliance" and "Jencks Act violations are subject to harmless error analysis." *United States v. Riley*, 189 F.3d 802, 805 (9th Cir. 1999). "The

---

[7] "There are three elements of a *Brady/Giglio* violation: '(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.'" *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011) (quoting *United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008)).

14

inquiry tends to collapse in our cases. Generally, a court's decision to strike a witness's testimony for failure to comply with the Jencks Act 'should rest on (1) a consideration of the culpability of the government for the unavailability of the material and (2) the injury resulting to the defendants.'" *Id*. at 806 (quoting *United States v. Sterling*, 742 F.2d 521, 524 (9th Cir. 1984)). Finally, "[w]hile a defendant need not prove prejudice to show a violation of the Jencks Act . . . when there is no prejudice, a witness's testimony need not be stricken." *Id*.

Here, I have already found that were was no prejudice to White from the government's failure. While the government was culpable in failing to secure the transcript, there was no injury to White. The state court transcript is before me and I thoroughly reviewed it *prior* to ruling on the motion to suppress.

The motion to suppress based on *Brady* or Jencks Act violations is DENIED.

### III. EXERCISE OF SUPERVISORY POWERS BASED ON WITHHOLDING OF EVIDENCE

Finally, White argues that the repeated discovery issues in this case – the failure to turn over all of the photographs taken at the scene, which were only produced as a result of defendant's subpoena to Sonoma County, and the failure to produce the state court transcript, which was only secured by defense counsel through his own efforts – compel the Court to exercise its supervisory powers to sanction the government for these significant failures by dismissing the indictment.[8]

The defense relies on *United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004) where the Ninth Circuit held that a "court may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation." *Id*. at 1109. As the Ninth Circuit explained, "the supervisory power may be used 'to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws) governing matters apart from the trial itself.'" *Id*. at 1109-1100 (quoting *United States v. Williams*, 504 U.S. 36, 46, 118 L. Ed. 2d 352, 112 S. Ct. 1735 (1992)). "To

---

[8] White also complains about the government's joint motion with Sonoma County to quash the subpoena seeking personnel records from the Sonoma County' Sheriff's Office. However, there was nothing improper about that motion to quash, which I denied *after* narrowing the scope of the information to be produced.

15

justify exercise of the court's supervisory powers, prosecutorial misconduct must (1) be flagrant and (2) cause 'substantial prejudice' to the defendant." *Id*. at 1110; *see also id*. ("A district court may not use its supervisory authority to dismiss an indictment for prosecutorial misconduct 'not prejudicial to the defendant.'").

Here, for the reasons discussed above, there has been no prejudice to White. Therefore, I cannot dismiss the indictment under my supervisory powers.[9]

In the alternative to dismissal of the indictment, White asks the Court (i) to convene a discovery hearing to allow the defense to develop the factual record regarding the government's failure to disclose the photographs and the trial court testimony, to ascertain whether there is any other non-produced discovery, and (ii) following that hearing (if the Court was not convinced at that point to dismiss the indictment), to convene a supplemental evidentiary hearing so that Sedgwick could be examined on the state court hearing transcript and any other materials that had not been produced prior to the August 18, 2014 evidentiary hearing. Docket No. 55 at 13.

The short answer to these requests is, No. The declaration from Officer Philp adequately explains the issues with the missing photographs. The culpability for the failure to produce lies with the Sonoma Sheriff's office and not with the government or Sedgwick. Government counsel has admitted that it was *his* fault that he overlooked that Sedgwick may have testified in state court on matters related to Angela White's arrest, and that counsel "fell short" of his usual Jencks/Rule 26.2 practice. Docket No. 57 at 9. The government acknowledges that it did not comply with its usual discovery practice and "as a result, will change how it coordinates prosecutions with local

---

[9] This case is unlike *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), where the Ninth Circuit upheld a trial court's dismissal of an indictment in response to repeated violations by the prosecution, including failing to turn over statements of a case agent who was also not listed on the government's witness list and failure to turn over evidence of prior convictions for at least three government witnesses who testified as well as others scheduled to testify. The withheld and belatedly produced evidence "totaled some 650 pages and consisted of rap sheets, plea agreements, cooperation agreements, and other information related to numerous government witnesses, including at least three important witnesses whose testimony was already complete." *Id*. at 1079. The court declared a mistrial and dismissed the indictment, rulings that were affirmed by the Ninth Circuit based on the district court's conclusion that defendants were severely prejudiced by the government's flagrant, willful, and bad faith conduct in recklessly disregarding its discovery obligations, and that defendants would be prejudiced by a new trial where the government witnesses could improve and correct their past testimony. *Id*. at 1084-86.

and state law enforcement agencies in order to ensure that there can be no questions about its discovery compliance." *Id*. at 9-10.

In the absence of the defense pointing to anything to suggest that other information relevant to the motion to suppress has not been produced, I am not inclined to prolong these proceedings. I have reviewed the state court transcript and the explanations surrounding the failures of the government to produce the photographs and the transcript, and I find those explanations problematic but adequate to persuade me that no further proceedings are warranted.

Notwithstanding my decision not to dismiss the indictment and not to hold further proceedings, I emphasize that the government fell seriously short of its duties to produce relevant discovery in this case. That this happened not once but twice, and that those failures were only uncovered because of the zealous advocacy of defense counsel, makes this situation all the more troubling. I will hold government counsel to his word that he will change how he coordinates with local and state law enforcement agencies to ensure that these sorts of omissions do not occur in the future. I do not expect to see these problems again. I direct government counsel to provide Douglas Wilson with a copy of this Order.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: October 31, 2014

WILLIAM H. ORRICK
United States District Judge